118 P.3d 116

DAVISCO FOODS INTERNATIONAL,
INC., Plaintiff–Appellant,

v.

GOODING COUNTY, a political sub-
division of the State of Idaho,
Defendant–Respondent.

No. 30744.

Supreme Court of Idaho,
Boise, March 2005 Term.

July 22, 2005.

Givens Pursley, LLP, Boise, for appellant. Christopher H. Meyer argued.

Brown & James, Gooding, for respondent. Philip A. Brown argued.

SCHROEDER, Chief Justice.

Davisco Foods International, Inc. (Jerome Cheese) applied for a special use permit in order to build a Reclaimed Water Project in Gooding County. The Gooding County Planning and Zoning Commission (P & Z) unanimously voted to grant Jerome Cheese the special use permit. William and Gloria Archibald (Archibalds) appealed the decision to the Gooding County Board of Commissioners (Board) which reversed the P & Z's decision. The district court affirmed the Board's decision. This appeal followed.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Jerome Cheese operates a cheese and whey making facility in Jerome County, Idaho. Massive quantities of water are used in the facility to clean the food-handling equipment. Jerome Cheese lawfully discharges the wastewater into different streams. Some of the water is treated by the City of Jerome's publicly owned treatment works (POTW). Some is released into an irrigation canal that empties into the Snake River. Some is used as crop supplements or animal feed.

The wastewater contains significant amounts of nitrates and phosphorous. Jerome Cheese wants to create a Reclaimed Water Project (Project) that would reduce the amount of these constituents in the water and allow storage of them for use as crop fertilizer. The Project would be located in Gooding County, seven miles from Jerome

Cheese's plant. The wastewater would be transferred via a pipe to the Project site for treatment. The Project site is a 900–acre farm in Gooding County owned by Jerome Cheese. The Project constitutes an industrial use. The farm owned by Jerome Cheese in Gooding County is in an agricultural zone. A special use permit is required for the Project.

Around September 1, 2000, Jerome Cheese applied for a special use permit with the Gooding County P & Z. The P & Z unanimously voted against issuing the special use permit. Jerome Cheese appealed to the Board which remanded the matter to the P & Z. Jerome Cheese submitted a revised application for a special use permit to the P & Z which included additional evidence supporting the Project. During this process, the Idaho Department of Environmental Quality (IDEQ) issued a final permit for the Project. On April 30, the P & Z voted 2–2 on Jerome Cheese's revised application, resulting in a denial of the special use permit. Jerome Cheese appealed to the Board.

While on appeal, Jerome Cheese requested a mediation session pursuant to I.C. § 67–6510(1) of the Local Land Use Planning Act (LLUPA). The Board granted the request. Jerome Cheese, Gooding County officials and interested members of the public participated in the mediation which resulted in a declaratory ruling by the district court regarding the conduct of the mediation and the participation of County officials in the mediation. Following the mediation, Jerome Cheese withdrew its appeal to the Board and filed a third application for a special use permit with the P & Z. The P & Z unanimously approved the issuance of the permit.

On or about May 15, 2002, the Archibalds appealed the P & Z's decision to grant the special use permit. The Archibalds own real property in Gooding County and live approximately 3.4 miles from the Project site. The Board voted 2–1 to reverse the decision of the P & Z and to deny the issuance of the special use permit. The Board failed to create a transcribable record of the meeting at which they deliberated and voted on the appeal. Jerome Cheese claimed that at the June 24 meeting Commissioner Elexpuru stated that she had "heard" things about the Project which were not in the record. In its

Findings of Fact and Conclusions of Law dated July 22, the Board determined that it was not in the "best interest of the citizens of Gooding County" to locate the Project in an agricultural zone.

Jerome Cheese petitioned the district court for judicial review of the Board's decision. Jerome Cheese alleged Commissioner Sauer was biased and had made statements to a local newspaper that he was against Jerome Cheese's Project and that he would "fight against such a proposal." The district court remanded the matter to the Board to create a transcribable record of the proceedings and to enable the Board to address the allegations of bias. On September 8, 2002, the Board unanimously voted to reverse the decision of the P & Z to approve the Project. The Board found that locating an industrial use in an agricultural zone was not in the best interest of Gooding County.

Jerome Cheese petitioned the district court for judicial review. On March 3, 2004, the district court issued its opinion upholding the decision of the Board to reverse the P & Z. The district court held that the Board properly followed its own ordinance and procedures, the Archibalds had standing to appeal, Commissioner Elexpuru was not required to recuse herself, and the issue of Commissioner Sauer's alleged bias was moot. Jerome Cheese appealed to this Court.

## II.

## THE ARCHIBALDS HAVE STANDING TO APPEAL THE P & Z's DECISION

Jerome Cheese contends that the Archibalds lack standing to appeal the P & Z's decision, maintaining that the Archibalds are too distant from the Project to be impacted in any manner unique to them.

The Gooding County Zoning Ordinance Article X, Section K indicates who may appeal a decision of the P & Z. The section states that, "[t]he applicant or any affected person (one who has an interest in real property which may be adversely affected) who appeared in person or in writing before the Commission may appeal the decision of the Commission to the Board...."

The Archibalds participated in the proceedings before the P & Z. The question

is whether they have a property interest that "may be adversely affected" by Jerome Cheese's Project. In their appeal from the P & Z decision the Archibalds stated that, "the odor from this sewage empoundment can cause irreparable economic damage to residential values. Beautiful properties can suddenly be unsellable just with a change in the wind direction." The Archibalds also appeared before the Board in the August 11, 2003, hearing on the Special Use Permit application. Mr. Archibald stated that:

> I know that if you make where I live an unpleasant place to live you're going to devalue my property.... You could devalue my property in lots of ways. And if you ruin the living conditions immediately adjacent to my property you've affected my property too. So where do you draw the line and where do you say an offensive odor is an offensive odor?

Jerome Cheese offered evidence that odors could not reach the Archibalds' property. However, an engineering expert who testified on behalf of Jerome Cheese before the Board in its August 11, 2003, hearing testified that under certain circumstances the Archibalds may be able to smell odors from Jerome Cheese's Project. The engineer stated that "our study indicates that if you made a big enough odor, yes, you could smell it at the Archibalds' house. It would have to be a very big odor inconsistent with the design of the wastewater treatment plant. But, yes, that's possible." There is some evidence that if Jerome Cheese's Project failed to adhere to the conditions imposed by the P & Z in issuing the special use permit, the Archibalds may be able to smell odors from the Project on their property. This is sufficient for the Board to determine that the Archibalds' property interest "may be adversely affected" if the special use permit is granted.

## III.

## THE BOARD EMPLOYED THE PROPER STANDARD OF REVIEW WHEN IT CONSIDERED THE ARCHIBALDS' APPEAL OF THE P & Z'S DECISION

 Jerome Cheese argues that Gooding County's zoning ordinance requires the Board to exercise an appellate-type review of the P & Z's decisions and, consequently, the Board should not have reviewed the Archibalds' appeal de novo. According to Jerome Cheese, the Board should have given more deference to the P & Z's decision, pointing to the language of the Ordinance which states that, "[t]he Board shall consider such finding[s], reports, minutes of the Commission's meeting and hearing, comments and recommendations as are forwarded to them by the Commission."

### A. Standard of Review

 This Court reviews agency determinations independently of a district court's intermediate appellate decision. *Evans v. Teton County*, 139 Idaho 71, 74, 73 P.3d 84, 87 (2003). An "affected person" may appeal a local land use decision pursuant to the judicial review provisions of Idaho's Administrative Procedure Act (IAPA). Idaho Code § 67–6521(1)(d) (2001). This Court must affirm a decision of the Board of Commissioners unless it determines that the Board's findings, inferences, conclusions or decisions: 1) violated constitutional or statutory provisions; 2) exceeded its statutory authority; 3) were made upon unlawful procedure; 4) were not supported by substantial evidence on the record as a whole; or 5) were arbitrary, capricious or an abuse of discretion. Idaho Code § 67–5279(3) (2001). "There is a strong presumption that the actions of the Board of Commissioners, where it has interpreted and applied its own zoning ordinances, are valid." *Evans*, 139 Idaho at 74, 73 P.3d at 87. The Board interpreted its Ordinance to give it the authority to conduct a de novo review of the P & Z's decision. That interpretation is entitled to a presumption of validity.

### B. The Board's de novo review of the Archibalds' appeal from the P & Z's decision was proper.

Gooding County Zoning Ordinance, Article X, Section A discusses special uses, stating that:

The allowance of a special use permit is discretionary with the Commission and may be granted only in the best interest of the general public.... The Commission may approve, conditionally approve or deny a special use permit under the conditions as herein specified and considering such additional safeguards as will uphold the intent of this Ordinance.

Section K of the Ordinance discusses the process of appealing a P & Z decision to the Board. That Section states that:

Fifteen (15) days after the appeal has been filed, the Board shall set a hearing date to consider the appeal. During the hearing, County staff may be available to present an application and answer questions. The Board shall consider such finding, reports, minutes of the Commission's meeting and hearing, comments and recommendations as are forwarded to them by the Commission. The Board may uphold, uphold with conditions, or overrule the Commission. The Board shall only overrule the Commission by a favorable vote of a majority of the full Board.

The Board's review of a P & Z decision is confined to a review of the record created before the P & Z. However, record-review is not dispositive as to the level of deference the Board is required to give to the P & Z's decision. In *South Fork Coalition v. Bd. of Comm'rs of Bonneville County*, 117 Idaho 857, 860, 792 P.2d 882, 885 (1990), the Court stated that "there is a strong presumption favoring the validity of the actions of zoning boards, and we have upheld the validity of their actions whenever they are free from capriciousness, arbitrariness or discrimination." *Id.* (citing *Ready–to–Pour, Inc. v. McCoy*, 95 Idaho 510, 511 P.2d 792 (1973)).

■ Gooding County's zoning ordinance does not explicitly state the standard of review to be employed by the Board when it reviews P & Z decisions. The Board has interpreted its Ordinance as allowing it to engage in de novo review of an appeal from a P & Z decision. The Board's interpretation of the Ordinance is reasonable considering the manner in which the review process works. For example, the Ordinance permits the Board to "uphold, uphold with conditions,

or overrule the Commission." If the Board upholds a P & Z decision with additional conditions imposed on the permit, the Board is in fact granting a different special use permit than was approved by the P & Z. The Board's decision is not remanded to the P & Z for approval. The Board is the final issuer of the permit. Additionally, when the P & Z denies a permit, and the Board overrules the P & Z's denial, the permit is granted by the Board. The matter is not remanded to the P & Z for approval. The Board is the final issuer of the permit. The Board's de novo review of the Archibalds' appeal from the P & Z's decision was proper.

## IV.

## THE BOARD'S ACTIONS IN THIS MATTER WERE NOT 1) IN VIOLATION OF A CONSTITUTIONAL OR STATUTORY PROVISION; 2) IN EXCESS OF STATUTORY AUTHORITY OF THE AGENCY; 3) MADE UPON UNLAWFUL PROCEDURE; 4) UNSUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD; OR 5) ARBITRARY, CAPRICIOUS OR AN ABUSE OF DISCRETION.

### A. Standard of Review

An "affected person" may appeal a local land use decision pursuant to the judicial review provisions of Idaho's Administrative Procedure Act (IAPA). I.C. § 67–6521(1)(d). This Court must affirm a decision of the Board of Commissioners unless it determines that the Board's findings, inferences, conclusions or decisions: 1) violated constitutional or statutory provisions; 2) exceeded its statutory authority; 3) were made upon unlawful procedure; 4) were not supported by substantial evidence on the record as a whole; or 5) were arbitrary, capricious or an abuse of discretion. I.C. § 67–5279(3). "There is a strong presumption that the actions of the Board of Commissioners, where it has interpreted and applied its own zoning ordinances, are valid." *Evans*, 139 Idaho at 74, 73 P.3d at 87.

■ The party appealing a Board of Commissioners' decision must show that the deci-

sion violated one of the provisions of I.C. § 67–5279(3) and that a substantial right of the party has been prejudiced, as indicated in I.C. § 67–5279(4). *Id.* at 74–75, 73 P.3d at 87–88 (citing *Price v. Payette County Bd. of Comm'rs,* 131 Idaho 426, 429, 958 P.2d 583, 586 (1998)). This Court will defer to the Board's findings of fact that are supported by substantial, competent, although conflicting evidence. *Id.* at 75, 73 P.3d at 88 (citing *Friends of Farm to Market v. Valley County,* 137 Idaho 192, 196, 46 P.3d 9, 13 (2002)).

## B. The Board's decision conformed to the applicable standards of judicial review.

The Gooding County Zoning Ordinance in Article I, Section D lists a number of purposes Gooding County intended to further in adopting the Ordinance. Section D states that the Ordinance is designed "to promote and protect the health, safety and the general welfare of the public." Another purpose of the Ordinance is "to provide for and protect agricultural lands and sensitive natural resource areas." Further, the Ordinance is designed "to protect and improve the County's quality of life so that the County will be increasingly valued by residents and non-residents as a desirable place for living, working, and recreation."

Article X, Section A of the Gooding County Zoning Ordinance states that "the allowance of a special use permit is discretionary with the Commission and may be granted only in the best interest of the general public." Article X, Section C of the Gooding County Zoning Ordinance is entitled "General Standards Applicable to All Special Uses." Nine criteria are listed in Section C, and the Commission is directed to "review the particular facts and circumstances of each proposed special use" in terms of the criteria "and shall find adequate evidence showing that such use at the proposed location" qualifies under the criteria. These nine criteria help define what is meant by "the best interest of the general public" in Section A. The first standard in Section C requires an analysis of whether the use would be better suited in an urban area. The second requires a proposed use to be harmonious with general and/or specific objectives of the Gooding County Comprehensive Plan or the Zoning Ordinance. The third states that a proposed use cannot "be hazardous or disturbing to existing uses." The sixth cautions against proposed uses that potentially create odors or problems with the water supply, damaging "persons, property or the general welfare."

The P & Z approved Jerome Cheese's application for a special use permit after imposing 59 conditions on the issuance of the permit. Upon appeal the Board had the authority to "uphold, uphold with conditions, or overrule" the P & Z's decision. The Board evaluated Jerome Cheese's special use permit application in light of the nine criteria listed in Article X, Section C of the Ordinance and determined that:

Ordinance 60 and the Comprehensive Plan require that special uses that would be best located in an urban area to remain in an urban area. It would not be in the best interest of the neighbors or other citizens of Gooding County to allow industrial waste that is generated in another county to be brought into Gooding County for treatment. It would best serve the citizens of Gooding County by requiring that the industrial wastewater continue to be treated at the Jerome City municipal treatment plant. The industrial wastewater has a potential to cause harm to the quality of water located in Gooding County and (sic) . . . allowing [Jerome Cheese] to bring industrial waste into Gooding County would not be harmonious with either the Comprehensive Plan or Ordinance No. 60. The locating of the industrial treatment system may have an adverse effect on the surrounding property owners if the treatment system ever malfunctioned or did not operate properly. Any such malfunction would be detrimental to the neighbors themselves or to their property. Additional odors and the possibility of contamination of water within Gooding County are serious risks to both the neighbors and to the citizens of Gooding County.

The bringing into Gooding County of industrial waste and the locating of a treatment system in an agriculturally zoned area is not in the best interest of the

citizens of Gooding County and the Planning and Zoning decision is, therefore, reversed and the application is denied.

■ It is not the role of the reviewing court to weigh the evidence. This Court must defer to the agency's decisions that are supported by substantial evidence in the record. *Id.* at 75, 73 P.3d at 88. Jerome Cheese's argument focuses on the evidence it presented as to the potential benefits of the Reclaimed Water Project. Even with these benefits, the P & Z issued Jerome Cheese a special use permit only after attaching 59 conditions to it. It appears that the Board focused more on the potential harm that could result to Gooding County if there were problems with the Project, rather than the benefits that may flow to the community because of the Project.

■ There is substantial evidence in the record supporting the Board's concerns about the Project's potential odor. In the hearing before the P & Z on April 30, 2002, counsel for Jerome Cheese, discussed the penalties that may be assessed against Jerome Cheese in the event the Project produced odors, suggesting "the establishment of a county level odor penalty policy which would provide for penalties of up to $2,500 a day for the most extreme violations, and that would be on top of violations that might be imposed by the Idaho Department of Environmental Quality or the EPA." A maintenance manager for Jerome Cheese testified at the P & Z Hearing about Gooding County's concerns about odors from the Project:

> Odor will be minimized through the treatment and proper operation. Minor odors may be detectable at the physical site, and I want to be very clear about this. They may be detectable at the site; however, because of the topographical area and the distance from public access, there should be no odors or objectionable odors off site. Now, that is the best we can do there, and with the odor management or the odor enforcement plan that we've asked for in the special use conditions we should be pretty well covered and so should the general public here.

Don Davis, a participant in the mediation proceedings with Jerome Cheese, submitted comments to the P & Z that were read into the record during the April 2003 hearing. The comments stated that, "Jerome Cheese says that they will manage the odor, if any. We know from past experience that self control is only served in the best interest of the controllers. The question still arises on effective controls of odors and who with authority can and will enforce these controls." Davis also articulated his concern that allowing an industrial use in an agricultural zone in this instance would set a precedent for businesses that industrial uses can be in agricultural zones in Gooding County in the future.

The Board reviewed the record established before the P & Z. In addition the Board presented questions to Jerome Cheese's engineering expert regarding odors from the Project. The engineer responded to a question from Commissioner Elexpuru about odors stating that:

> [Y]ou could go out [to the proposed Project site] right now and do something that made a tremendous odor occur, and our study indicates that if you made a big enough odor, yes, you could smell it at the Archibalds' house. It would have to be a very big odor inconsistent with the design of the wastewater treatment plant. But, yes, that's possible.

The Board is entrusted with the authority to act in the "best interests" of the citizens of Gooding County. The Board's decision evaluated the Project in terms of the criteria listed in Article X, Section C of the Ordinance. The Board's action reflects its concern about the harm that could potentially be caused by the Project, especially with respect to the Project's odors. There is substantial evidence in the record indicating that odor problems were a major concern for the mediation panel, the P & Z and the Board. Therefore, though conflicting evidence was before the Board about the likelihood and severity of odors, substantial evidence in the record supports the Board's decision to avoid the risk of odors and other problems that could be caused by the Project. The Board did not abuse its discretion by overruling the P & Z's decision.

## V.

## THE RECORD DOES NOT ESTABLISH THAT COMMISSIONER SAUER WAS IMPERMISSIBLY BIASED.

Jerome Cheese maintains that Commissioner Sauer made statements that impermissibly deprived the proceedings of the appearance of fairness and that where a Commissioner may potentially be biased, he or she should be barred from participating in proceedings.

### A. The Constitutional Standard

 "The Due Process Clause entitles a person to an impartial and disinterested tribunal. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980). This requirement applies not only to courts, but also to state administrative agencies ..." *Eacret v. Bonner County*, 139 Idaho 780, 784, 86 P.3d 494, 498 (2004) (citing *Stivers v. Pierce*, 71 F.3d 732 (9th Cir.1995)).

### B. Commissioner Sauer's statements do not give rise to a finding that he was impermissibly biased and required to be disqualified from participation in the proceedings.

 Jerome Cheese's contention that Commissioner Sauer was impermissibly biased against its Project is based on a statement attributed to Sauer published in the Gooding County Leader. The October 26, 2000, article discussed Sauer and another candidate for the office of County Commissioner. The article stated that, "[b]oth candidates say they are absolutely against Jerome Cheese's proposal to pipe waste from its Jerome plant to the Kober farm in Gooding County and will fight against such a proposal." During the litigation in this matter, Sauer admitted that he had stated to the Gooding County Leader that he was opposed to Jerome Cheese's proposal but denied that he would "fight against" the proposal. At the hearing on remand, Sauer indicated that he maintained an open mind about the Project at all relevant times.

In *Eacret* this Court stated that:

A decision maker is not disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that the decision maker is "not capable of judging a particular controversy fairly on the basis of its own circumstances."

*Id.* at 785, 86 P.3d at 499 (quoting *Hortonville Joint School Dist. No. 1 v. Hortonville Education Ass'n*, 426 U.S. 482, 493, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1, 9 (1976)).

The district court remanded this matter to the Board to create a transcribable record and to give the Commissioners an opportunity to address the claims of bias. At the Board's hearing after the remand Sauer addressed the allegations that he was biased against Jerome Cheese's Project:

I did state at the time that I was opposed to the idea. I did not say that I would fight against such a proposal, but I did state that I was against it at the time. I can honestly say that when Jerome Cheese made their application and it was appealed to us I was open minded on that and I did not come to a conclusion until that—the day of our findings.... I still have an open mind. Absolutely. Because it's been remanded back by Judge Carlson.

The Gooding County Leader's article was published nearly three years before the Board voted for the second time on the appeal from the P & Z's decision. The article's statement is not a direct quote from Sauer, and he denied stating that he would "fight against" Jerome Cheese's Project. Sauer's statements were made before he was elected Commissioner. The statement occurred prior to the mediation and the numerous conditions proposed by P & Z in its approval of the special use permit. Sauer denied that he had predetermined the outcome of the appeal and testified that he remained open minded throughout the proceeding. The proposal before him as a Commissioner was considerably different from the proposal when he was a candidate. The newspaper article, alone, under the facts of this case, is insufficient to support a finding that Sauer was impermissibly biased in considering the appeal from the P & Z's decision.

## VI.

## RECUSAL OF COMMISSIONER ELEXPURU WAS NOT REQUIRED

 Jerome Cheese maintains that Commissioner Elexpuru made statements which indicate that she must have had improper ex parte contacts, because there was no evidence in the record supporting those statements. During the hearings Elexpuru said that she had "heard various things" about Jerome Cheese's project. Jerome Cheese argues that her comments and questions were not based on the record, and she was, therefore, relying on information gained from improper ex parte contacts.

Jerome Cheese maintains that the information relied upon by Elexpuru was written on yellow notepad paper. When confronted about the substance of the notes, Elexpuru initially denied making the notes, then admitted that she destroyed them. Jerome Cheese asserts that these events give rise to the spoliation doctrine which permits an inference that the destroyed evidence was unfavorable to the party to whom it applied.

The claim that Commissioner Elexpuru was required to recuse herself by reason of improper ex parte contacts was reviewed and rejected by the district court. There is no error in that determination. The record is lacking facts or sufficient inferences to establish a bias that would compel recusal.

## VII.

## NEITHER PARTY IS ENTITLED TO ITS ATTORNEY FEES ON APPEAL

Gooding County did not request attorney fees. Jerome Cheese requested costs and fees but is not the prevailing party. Neither party is entitled to its attorney fees.

## VIII.

## CONCLUSION

The Archibalds had standing to appeal the P & Z's decision to the Board. The Board was entitled to conduct a de novo review of the appeal. The Board's decision to reverse the P & Z and deny Jerome Cheese's application for a special use permit was supported by substantial evidence in the record, was not arbitrary, capricious or an abuse of discretion, and otherwise conformed to the applicable judicial review standards. Commissioners Sauer and Elexpuru were not impermissibly biased. The decision of the district court affirming the decision of the Gooding County Board of Commissioners is affirmed. Gooding County is awarded costs. Neither party is entitled to its attorney fees on appeal.

Justice EISMANN and Justice Pro Tem KIDWELL concur.

Justice TROUT dissents without opinion as to Part V and concurs in the remainder.

Justice JONES dissenting.

The majority holds that the Archibalds had "standing" to appeal the P & Z's decision to the Board and, having so held, determines also that the Board's decision was supported by substantial evidence and comported with the "reasoned decision-making" requirements of I.C. § 67–6535. My analysis of the facts and the law leads me to a contrary result. Accordingly, I respectfully dissent.

## I.

"Standing" refers to the status one must hold to invoke court jurisdiction. *Noh v. Cenarrusa*, 137 Idaho 798, 800, 53 P.3d 1217, 1219 (2002). By appealing the P & Z's decision to the Board, the Archibalds were seeking an administrative remedy, not a judicial one. The constitutional test for standing, then, does not apply to the question of whether the Archibalds held the status necessary to appeal the P & Z's decision to the Board. Rather, Gooding County's zoning ordinance applies. It reads, in relevant part: "The applicant or any affected person (one who has an interest in real property which may be adversely affected) who appeared in person or in writing before the Commission may appeal the decision of the Commission to the Board...." Gooding County, Idaho Zoning Ordinance No. 60, Art. X, Sec. K (1995). Therefore, the question in this case

really is, what does it mean to have an interest in property that "may be adversely affected"? I believe it means more than the what-ifs on which the Board's decision relied. Read as the Board and majority have read it, practically any allegation a landowner might advance would bestow the right to appeal a decision, whether or not the landowner has shown any reasonable factual basis for the allegation.

This Court's task in interpreting a statute or ordinance is to give effect to the intent of the body that wrote it. *Lockhart v. Dept. of Fish and Game,* 121 Idaho 894, 897, 828 P.2d 1299, 1302 (1992). Reviewing courts generally presume that a local governing body's interpretation of its own ordinance is valid. *Friends of Farm to Market v. Valley County,* 137 Idaho 192, 197, 46 P.3d 9, 14 (2002). The plain language of an unambiguous ordinance, of course, controls the meaning. *Evans v. Teton County,* 139 Idaho 71, 77, 73 P.3d 84, 90 (2003). But the word "may," as used in the County's ordinance, is very expansive— so much so that it is, I believe, ambiguous and in need of a narrower definition than the Board and the majority have implicitly given it.

Gooding County's ordinance reads almost exactly like LLUPA's "affected person" statute, found at I.C. § 67–6521(1)(a). There, an "affected person" is "one having an interest in real property which may be adversely affected by the issuance or denial of a permit ..." In the judicial standing context, the Court has indicated that the degree of likelihood of harm is a relevant factor in deciding whether a person "may be adversely affected." [1] In *Evans,* the Court entertained two landowners' challenge to a decision of the Teton County Board of Commissioners approving a 780–acre hotel/golf course/equestrian facility/500–home subdivision/helicopter pad project south of Victor in sparsely populated Teton County. The landowners, whose rural homes were on property adjacent to the project, "clearly" had standing to appeal.[2] *Evans v. Teton County,* 139 Idaho at 75, 73 P.3d at 88. Landowners in Tetonia (17 miles from Victor) or Driggs (about 8.6 miles) or even Victor itself, the Court wrote, may not be able to "show" their property would be adversely affected. *Id.*

The Court's observation about landowners other than those adjacent to the property, reflects a common-sense approach to the question of whether one is a person whose property "may be adversely affected." This is consistent with the Court's longstanding principle that legislative intent may be gleaned not only from the language used, but also "on grounds of policy or reasonableness." *Summers v. Dooley,* 94 Idaho 87, 89, 481 P.2d 318, 320 (1971); *see also Thomson v. City of Lewiston,* 137 Idaho 473, 478, 50 P.3d 488, 493 (2002). It also comports with the idea that interpretations of even plain language that lead to absurd results are not favored. *Kootenai Med. Ctr. v. Bonner County Comm'rs,* 141 Idaho 7, 9, 105 P.3d 667, 669 (2004).

In *Evans,* the thing causing the harm was the project itself. The harm would be caused as a direct result of the permit being granted. Here, however, the alleged harm is purely speculative (if not highly improbable), possible to occur only if everything goes wrong from a regulatory, mechanical, and meteorological standpoint—that is, the Archibalds might be able to get a whiff of the plant if the plant malfunctioned and substantially exceeded allowable odor standards, and if the County failed to enforce the permit requirements, and if the prevailing wind blew in a nonprevailing direction toward the Archibalds. The distance of the Archibalds' property from the project, combined with other telling facts in the record, demonstrate that they do not fit the description of persons whose property "may be adversely affected."

---

1. When conducting a test for judicial standing, LLUPA's "may be adversely affected" requirement is read to require no less than the constitutional minimums: as the Court has repeatedly said, the legislature cannot relieve a party from meeting those requirements. *See Evans v. Teton County,* 139 Idaho at 75, 73 P.3d at 88; *Noh v. Cenarrusa,* 137 Idaho at 801, 53 P.3d at 1220.

2. Apparently, the claimed adverse effects of this project were self-evident; no analysis of the project's effects on property values or quiet enjoyment was conducted.

Consider the following: the Archibalds live about three and a half miles away from the project site. The prevailing winds do not blow their direction. The plant is designed to produce far less hydrogen sulfide than the amount necessary to offend the olfactory senses. The evidence shows that the plant would have to produce over twice the allowable amount of hydrogen sulfide for the Archibalds to smell it. Among the 59 conditions in the P & Z's proposed permit is one providing that penalties will be imposed when odor, detectible off the plant site, is sustained for a certain period of time. Another condition provides that if the plant continues to produce an offensive amount of odor, the County can revoke Jerome Cheese's permit. In short, the occurrence of the alleged harm depends on the happening of too many speculative contingencies to say with a reasonable amount of comfort that the Archibald's property may be adversely affected. The Archibalds certainly did not "show" there to be a possibility that any of these contingencies might occur. *See Evans v. Teton County,* 139 Idaho at 75, 73 P.3d at 88. One might conclude that the Archibalds have even failed to pass the smell test approved by the majority.

## II.

Even if the Archibalds satisfied the ordinance's requirements to appeal the decision to the Board, I would still hold that the Board's decision fails to meet the requirements set forth in the Idaho Administrative Procedure Act (APA) and in LLUPA.

The Court adheres to the rule that under the APA, when an agency's findings disagree with the hearing officer's recommended order, the reviewing court still examines the agency's findings and whether they are supported by substantial evidence. *Pearl v. Bd. of Prof'l Discipline,* 137 Idaho 107, 112, 44 P.3d 1162, 1167 (2002). But, in such cases the Court "will scrutinize the agency's findings more critically," since the Court imposes on agencies "an obligation of reasoned decision making that includes a duty to explain why the agency differed from the administrative law judge." *Id.*

Our Court of Appeals first adopted this rule in *Woodfield v. Bd. of Prof'l Discipline,* 127 Idaho 738, 746, 905 P.2d 1047, 1053 (Ct. App.1995). In *Woodfield* the Board of Professional Discipline of the State Board of Medicine issued an order revoking the appellant physician's license to practice medicine. The hearing officer had expressed concerns with the physician's conduct but did not recommend the physician's license be revoked. The Board of Medicine conducted an independent review and "depart[ed] significantly" from the hearing examiner's findings. 127 Idaho at 743, 905 P.2d at 1052. On review, the district court required the Board of Medicine to articulate its reasons for departing from the hearing examiner's decision. The Court of Appeals agreed, explaining:

[I]t is consistent with the Board's statutory obligation to render a reasoned decision to require the Board to identify facts, as well as inferences drawn from the facts upon the application of its expertise and judgment, which underlie its decision. Such an explanation is essential to meaningful judicial review, and it is a logical adjunct to the agency's statutory duty to supplement its decisions with findings of fact and conclusions of law.

127 Idaho at 747, 905 P.2d at 1054. The court grafted this rule from several federal cases involving the federal Administrative Procedure Act. *Id.* at 746 n. 3, 905 P.2d at 1053 n. 3. Because the court was not satisfied the Board of Medicine had met its obligation, the court remanded the Board of Medicine's decision "to delineate its own findings as the basis for its contrary conclusion to that of the hearing officer." *Id.* at 747, 905 P.2d at 1054.

This Court has not considered whether to extend *Woodfield* to cases under LLUPA where the county board of commissioners reverses its planning and zoning commission. Why the principle would not apply in such cases, however, I cannot say. Just as agencies must issue a reasoned statement for their conclusions—I.C. § 67–5248 (which requirement formed part of the basis for the court's rule in *Woodfield, see* 127 Idaho at 746, 905 P.2d at 1053)—so, too, must county boards of commissioners issue a reasoned statement explaining their decisions under

LLUPA. I.C. § 67–6535. If the APA's reasoned statement requirement produced the rule in *Woodfield,* one could reasonably conclude the rule would apply to decisions that must conform to I.C. § 67–6535.

In this case, the record clearly demonstrates that the Board failed to explain its departure from the P & Z's extensive decision. The Board articulated these two reasons for denying the permit: (1) the activity is an industrial use sought in an agricultural zone; and (2) the plant may adversely affect surrounding landowners if the plant ever malfunctioned or did not operate properly. The Board thus concluded that allowing out-of-county waste to be transported to and treated in Gooding County would not be in the best interests of county citizens. Despite the P & Z's extensive fact finding and comprehensive proposed permit, the Board offered no explanation for its reversal and summarily decided there was nothing Jerome Cheese could do to obtain a permit. Such conclusory decisions do not inspire confidence in the decision-making process.

Even without applying the *Woodfield* rule to LLUPA cases, the Board's decision fails I.C. § 67–6535. It neither mentions the P & Z's facts, nor does it explain (with any appreciable depth) "the relevant contested facts relied upon, and ... the rationale for the decision based on the applicable provisions of the comprehensive plan, relevant ordinance and statutory provisions, pertinent constitutional principles and factual information contained in the record." I.C. § 67–6535(b). As mentioned above, the decision utterly fails to discuss the facts on which the P & Z relied, and provides only conclusory, unsubstantiated reasons for its decision. In a case like *Evans,* where a board simply adopts its planning and zoning P & Z's findings and affirms the decision, there is no requirement that the board make findings, "only that they are made." *Evans v. Teton County,* 139 Idaho at 80, 73 P.3d at 93. However, in a case where the board reverses its planning and zoning commission, the board has no commission findings to adopt, since it reversed the commission's decision. In such a case, the statute requires the board to make and articulate findings that support the decision. Having

failed to do so, the Board's decision is subject to reversal and remand in order to provide an explanation that satisfies I.C. § 67–6535.